AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT
3/25/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: DTA   DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT
3/25/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: KH   DEPUTY

United States of America

v.

MICHAEL DE LA CRUZ,   Defendant.

Case No. 8:22-mj-225-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of March 23, 2022, in the county of Orange in the Central District of California, the defendant violated:

| Code Section | Offense Description |
| --- | --- |
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A) (vi) | Possession with Intent to Distribute Fentanyl |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
Complainant's signature

Bryan K. Cramer, TFO- DEA
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: March 25, 2022

/s/ Autumn D. Spaeth
Judge's signature

City and state: Santa Ana, California

Hon. Autumn D. Spaeth, U.S. Magistrate Judge
Printed name and title

AUSA
Kristin Spencer
(x3531)

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, Bryan K. Cramer, being duly sworn, declare and state as follows:

**INTRODUCTION**

1. I am an investigative law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7). As such, I am empowered to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2. I am a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA"), an agency of the Department of Justice. I have been assigned as a TFO since May 2020. I have been a sworn Police Officer with the City of Westminster since December 2015. Prior to being a sworn Police Officer with the City of Westminster, I was a sworn Deputy Sheriff with the County of Los Angeles from June 2012 to December 2015. I am currently assigned to Los Angeles Field Division ("LAFD"), Orange County District Office ("OCDO"). At the OCDO, I am assigned to Enforcement Group-1 ("ENF-1"), an enforcement group investigating narcotics trafficking and money laundering violations under Titles 18 and 21 of the United States Code.

3. During my employment as a police officer, I have investigated or assisted in the investigation of approximately four hundred drug-related crimes, including possession, transportation, sales, use, manufacturing, and cultivation of narcotics and narcotics-related equipment. I have been involved in the investigation of numerous narcotic-related crimes. I

have monitored criminal narcotic activity, including the following: the packaging, concealment, use, effects, manufacturing, sales, cultivation, and transportation of narcotics. I have conducted and been involved in several mobile and static surveillances of known and suspected drug traffickers. I have also participated in undercover buy/bust and buy/walk operations. I have personally arrested approximately 150 persons for crimes involving controlled substances and dangerous drug violations. I have personally interviewed and interrogated persons arrested for various drug violations and have also witnessed interviews and interrogations conducted by other officers and Narcotic Detectives. I have investigated and assisted in investigations pertaining to persons suspected of being under the influence of a controlled substance more than 100 times.

### PURPOSE OF AFFIDAVIT

4. This affidavit is made in support of a criminal complaint for MICHAEL DE LA CRUZ for a violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(A)(vi) (Possession with Intent to Distribute Fentanyl).

5. Unless otherwise stated, the facts set forth in this affidavit are based upon my personal observations; my training and experience; oral and written reports about this investigation; and physical surveillance conducted by federal agents or local law enforcement agencies, which has been reported to me either directly or indirectly.

6. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversation and statements described in this affidavit are related in substance and in part only.

## SUMMARY OF PROBABLE CAUSE

7. On March 23, 2022, Westminster Police Department ("WPD") officers, together with the Orange County Fire Authority ("OCFA"), responded to 15150 Magnolia Street, apartment number 250, in Westminster, California regarding a possible overdose. Upon arriving, WPD officers located an unresponsive male, later identified as D.G. D.G. was declared deceased by OCFA shortly after arrival.

8. WPD Officers determined that the apartment was rented by MICHAEL DE LA CRUZ, who had invited D.G. to stay with him for the past two days. During an interview with DE LA CRUZ, DE LA CRUZ admitted that he had hidden firearms and narcotics in the apartment prior to WPD's arrival.

9. WPD detectives obtained a search warrant for the apartment and located approximately 3,420.4 grams of suspected fentanyl and approximately 1,487.8 "M30" fentanyl pills inside the apartment, along with several firearms, firearms accessories, and ammunition.

**STATEMENT OF PROBABLE CAUSE**

10. Based on my review of law enforcement reports, conversations with other law enforcement officers, and my own knowledge of the investigation, I am aware of the following:

A. **Westminster Police Department Officers respond to DE LA CRUZ's Apartment**

11. On March 23, 2022, at approximately 2:58 p.m., WPD officers, together with the OCFA, responded to 15150 Magnolia Street, apartment number 250, in Westminster, California in response to reports of a twenty-three year-old male who was reportedly not breathing and suffering from a possible drug overdose.

12. Upon entering the apartment, WPD officer R. Perez saw a male, later identified as D.G., lying on his back inside of the entryway, which was connected to the living room of the apartment. After examining D.G., an OCFA paramedic pronounced D.G. deceased at approximately 3:02 p.m.

13. Officer Perez contacted two additional males at the apartment, who were later identified as MICHAEL DE LA CRUZ and Nicholas Del Aguila.

B. **Statement from Michael DE LA CRUZ**

14. DE LA CRUZ told Officer Perez that he was renter of the apartment. DE LA CRUZ said that he had allowed D.G. to sleep on the floor of his apartment for approximately two days prior to his death because D.G. had previously been living out of his vehicle.

4

15. With respect to the circumstances surrounding D.G.'s death, DE LA CRUZ stated that he had arrived home at the apartment on March 23, 2022, at approximately 9:30 a.m. When DE LA CRUZ opened the front door, he saw D.G. laying on his back snoring in the entry way inside of the front door. DE LA CRUZ believed D.G. was "fucked up." DE LA CRUZ went to the bedroom and went to sleep. DE LA CRUZ woke up at approximately 12:53 p.m., took a shower, and planned on leaving the house by 2:00 p.m. to pick up his daughter from school in Harbor City, California. DE LA CRUZ said he came out of his room at approximately 2:16 p.m. and called his mother to tell her he was not going to be able to pick up his daughter.

16. DE LA CRUZ said that when he exited his room at 2:16 p.m., D.G. was laying on his back in the entry way with vomit around his mouth. According to DE LA CRUZ, D.G. had not moved from the position that DE LA CRUZ had seen him in earlier that morning. DE LA CRUZ placed D.G. on his side.

17. When DE LA CRUZ saw the vomit on D.G., he attempted to pull D.G. to the bathtub to try and put water on him. However, D.G. was too heavy, so DE LA CRUZ pulled him back into the living room. DE LA CRUZ then grabbed a towel and attempted to wring water onto D.G. to wake him up, to no avail. When DE LA CRUZ's efforts to wake D.G. didn't work, DE LA CRUZ called 911.

18. DE LA CRUZ stated that D.G. had been sleeping in the living room of the apartment for the past two nights. The living room is located directly next to the front door entry way.

19. Officer Perez asked DE LA CRUZ if D.G. took any prescription medication. DE LA CRUZ stated that D.G. is known to take Xanax, Oxycontin, and Percocet.

   C.   **Statement of Nicholas Del Aguila**

20. Officer Perez also interviewed Del Aguila, who told Officer Perez that he had received a phone call from DE LA CRUZ at approximately 2:16 p.m. Following that call, Del Aguila drove to the apartment from Del Aguila's home in the city of Carson. When Del Aguila arrived at the apartment, he saw D.G. on the floor and began attempting to administer CPR. Del Aguila told DE LA CRUZ to call an ambulance. Del Aguila said that when he blew in D.G.'s mouth, he observed "black stuff" come out of his mouth.

   D.   **Statement of Jasmine Perez**

21. WPD Detective Jezulin later arrived on scene and interviewed Jasmine Perez, who had also arrived on scene. Perez told Detective Jezulin that she and D.G. had been dating for approximately seven years but did not live together. Perez saw D.G. on March 18 parked in front of his residence. D.G. appeared to be passed out in the driver's seat with aluminum foil drug paraphernalia on his lap. Perez left the area after the incident and broke up with D.G..

22. On March 22, at 11:52 p.m., Perez spoke with D.G. via facetime video chat. D.G. was walking into an apartment complex with a friend Perez knew as "Gustavo." The facetime call lasted approximately 36 seconds. Perez recognized the apartment complex as 15150 Magnolia Street, which is the location of DE LA

CRUZ's apartment. Perez had visited D.G. at DE LA CRUZ's apartment the previous day.

### E. Second Interview of DE LA CRUZ

23. WPD Detective Lopez asked DE LA CRUZ if he would be willing to come to WPD to provide a more detailed account regarding the incident. DE LA CRUZ agreed and was transported to WPD un-handcuffed by Detective Gradilla.

24. At WPD, DE LA CRUZ told Detectives Lopez and Gradilla that he had allowed D.G. to move into the living room area of DE LA CRUZ's apartment on March 21 because D.G. was living out of his vehicle. On March 23, at approximately midnight, DE LA CRUZ arrived at his apartment to find D.G., whom DE LA CRUZ referred to as "Quiks," and another male subject, known to DE LA CRUZ as "Gustavo," inside of DE LA CRUZ's apartment. DE LA CRUZ further stated that while walking through his apartment, he had seen several handguns and rifles as well as suspected cocaine in various locations in the apartment. DE LA CRUZ noticed D.G. was awake and alert. Shortly after DE LA CRUZ arrived home, "Gustavo" left the location without saying anything to DE LA CRUZ.

25. DE LA CRUZ stated that he confronted D.G. about "Gustavo" being at the apartment without DE LA CRUZ's approval. DE LA CRUZ also confronted D.G. about blood DE LA CRUZ had noticed in several parts of the apartment. Although DE LA CRUZ initially told Detective Gradilla he was only at the residence for approximately six minutes, DE LA CRUZ later stated he was at the residence for approximately 30 minutes before leaving again.

7

26. DE LA CRUZ stated that he then went to his mother's house in Harbor City, California, before arriving back at his apartment at approximately 9:23 a.m. to find D.G. laying on his back asleep in the entry way. DE LA CRUZ walked around D.G. into his bedroom.

27. DE LA CRUZ stated that he took a short nap and woke up at approximately 12:40 p.m. DE LA CRUZ then took a shower and exited his bedroom into the living room at approximately 1:15 p.m. At that point, DE LA CRUZ saw vomit on D.G.'s face and on the floor next to D.G., who was still on the floor lying on his back.

28. DE LA CRUZ proceeded to wipe the vomit from D.G's face and stated he could hear D.G. groaning, but not conscious. DE LA CRUZ decided to attempt to drag D.G. into the bathtub but was unable to do so. DE LA CRUZ then threw water on D.G. in an attempt to help D.G. regain consciousness but was unsuccessful.

29. Approximately one hour later, DE LA CRUZ contacted his friend, Nicholas Del Aguila and asked for his help. Del Aguila drove from the city of Carson to assist DE LA CRUZ. DE LA CRUZ stated that Del Aguila administered Narcan because D.G. was a known user of narcotics.

30. DE LA CRUZ stated that at some point, either prior to calling Del Aguila or prior to WPD arriving on scene, he had concealed several firearms in his bedroom and discarded drugs in the kitchen trash. DE LA CRUZ stated that the drugs belonged to D.G. DE LA CRUZ stated that it was against his religion to use drugs.

8

F.   **Search of DE LA CRUZ's Apartment**

31. WPD conducted a search of DE LA CRUZ's apartment pursuant to a state search warrant. In DE LA CRUZ's bedroom,[1] WPD found a brick-sized vacuum-sealed package containing a white powdery substance that appeared to be fentanyl concealed in a pillowcase on the bed. WPD found an additional brick-sized vacuum-sealed packaged containing a white powdery substance that appeared to be fentanyl inside of a clear storage container inside of the walk-in closet. Based on my training and experience, narcotics that are intended for personal use would not be packaged in a vacuum-sealed packages. Rather, such packages are intended to be either redistributed to narcotics dealers or repackaged in smaller quantities for distribution to users.

32. While searching the kitchen area of the apartment, WPD found the following:

a.   Inside of the trash can, a clear plastic container containing what appeared a large number of blue pills stamped "M30", a gallon sized zip log bag containing suspected powdered fentanyl, and a metal thermos containing additional blue "M30"pills;

b.   In a cabinet above the kitchen sink, a ceramic bowl containing additional blue "M30" pills; and

---

[1] During his interview with Detectives Lopez and Gradilla, DE LA CRUZ stated that D.G. was permitted to enter DE LA CRUZ's bedroom in order to use the bathroom. He confirmed that D.G. had previously been inside of DE LA CRUZ's bedroom.

9

    c.    In a cabinet above the refrigerator alcove, three baggies containing additional blue "M30" pills.

33. Based on my training and experience, I believe that the blue "M30" pills found in DE LA CRUZ's apartment were counterfeit oxycodone pills containing fentanyl. Unlike the pills found in DE LA CRUZ's apartment, true oxycodone "M30" pills are usually white in color. Furthermore, based on my training and experience, the quantity of pills found in DE LA CRUZ's apartment was much larger than a quantity that would be expected for personal use. WPD also found a digital scale in the kitchen area of the apartment, which, based on my training and experience, is consistent with narcotics sales.

34. WPD also found several firearms, firearms accessories, and ammunition in various calibers in DE LA CRUZ's bedroom and living room area of the apartment. For instance, in the bedroom, WPD found a rifle with a magazine loaded with ten rounds of ammunition in its original box under the bed and a handgun wrapped in clothing in the top drawer of the dresser. In the living room, WPD found a storage bin under the television containing four additional firearms, approximately a dozen assorted firearms magazines, and ammunition in various quantities and calibers.

35. WPD detectives later weighed the suspected fentanyl and "M30" fentanyl pills. The total combined weight of the suspected powdered fentanyl was 3,420.4 grams and the total combined weight of the suspected counterfeit "M30" pills was 1,487.8 grams.

## **CONCLUSION**

44. Based on the foregoing, there is probable cause to believe that Michael DE LA CRUZ has committed a violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(A)(vi): Possession with Intent to Distribute Fentanyl.

                                                     /s/
                                       Bryan K. Cramer,
                                       Task Force Officer
                                       Drug Enforcement Administration

Attested to by the applicant by telephone in accordance with the requirements of Fed. R. Crim. P. 4.1 on this day, March 25th, 2022.

   /s/ Autumn D. Spaeth
UNITED STATES MAGISTRATE JUDGE

11